# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

*In re* **D.O.**

**No. 17-0831** (Kanawha County 16-JA-609)

**FILED**

**February 23, 2018**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Mother S.O., by counsel Matthew A. Victor, appeals the Circuit Court of Kanawha County's August 29, 2017, order terminating her parental rights to D.O.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Brandolyn N. Felton-Ernest, filed a response in support of the circuit court's order. The guardian ad litem ("guardian"), Bryan B. Escue, filed a response on behalf of the child also in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred by terminating her parental rights without first providing her a meaningful improvement period tailored to the specific needs of petitioner and the child.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In December of 2016, the DHHR filed an abuse and neglect petition against petitioner. The DHHR alleged that the child was the victim of sexual abuse by a neighbor, had severe emotional problems and suicidal ideations, and that petitioner refused to obtain therapy or treatment for the child. The DHHR also alleged that petitioner frequently told the child that he was possessed by the devil, ruining her life, and getting in the way of things for her. Further, the DHHR noted that there was no electricity or running water in the home. Both the DHHR and the child's school offered services to petitioner, but she refused any assistance. Finally, the DHHR alleged that petitioner failed to provide the child with necessary food, clothing, supervision, and housing, and was not sufficiently motivated and organized to provide for the child on an ongoing basis. Later in December, the circuit court held a preliminary hearing during which a Child Protective Services ("CPS") worker testified that the child was being housed in Highland

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W.Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W.Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W.Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990).

1

Hospital after a suicide attempt and that petitioner refused to let the child be prescribed necessary medications and declined to participate in any services.

In March of 2017, petitioner underwent a psychological evaluation. The evaluating psychologist reported that petitioner presented with apparent affect dysregulation, problems with attachment to the child, defensiveness, and chaos in her interpersonal relationships. The psychologist opined that there was a reasonable likelihood that petitioner would have received a personality disorder diagnosis had she been fully compliant with the evaluation. Petitioner's prognosis for improved parenting was considered poor due to her lack of attachment to the child and attitude of entitlement. The report indicated that petitioner was satisfied with herself and saw no need to change her behavior. Further, petitioner reported anger over what she perceived as CPS's failure to aid her with an older, now adult child, and stated "[l]et the [S]tate raise him for his teenage years. They owe him a better life, since I am doing such a bad job. Let them do it." The psychologist recommended some courses of intervention for petitioner's benefit, but opined that they were currently unlikely to facilitate minimally adequate parenting within a reasonable time frame.

The circuit court held an adjudicatory hearing in May of 2017, during which the DHHR moved to incorporate the testimony taken at the preliminary hearing. Petitioner then testified that the child initiated the call to CPS because he was in trouble for being suspended from school, and that she complied with the initial safety plan at that time. Regarding lack of utilities, petitioner explained that a truck accident near her home had rendered her without electricity for some time because the company refused to pay for the damage, and that she did not have running water in the home because she believed the city water was unsanitary. Petitioner testified that she bought bottled water for drinking and sanitation purposes. When asked about the child's mental health, petitioner explained that he had been sexually abused by a neighbor and that he subsequently refused to undergo therapy. Petitioner testified that she told the child that he could speak to a counselor at school but admitted that she did not notify the school staff of the situation. Petitioner believed that the child was being traumatized by the treatment at Highland Hospital, where he had been hospitalized after his suicide attempt at school. After hearing evidence, the circuit court found that petitioner refused to obtain treatment for the child's severe emotional problems and suicidal ideations, was emotionally abusive to the child by telling him that he was possessed by the devil and ruining her life, and refused all services. Accordingly, the circuit court adjudicated petitioner as an abusing parent and ordered her to follow the recommendations set forth in her psychological evaluation report, including therapy, visitation, and drug testing.

In June of 2017, the circuit court held a dispositional hearing, during which two witnesses testified regarding petitioner's noncompliance with services. A CPS worker testified that petitioner failed to comply with the recommendations set forth in the psychological evaluation report, including failing to participate in adult life skills and individualized parenting classes, failing to attend therapy sessions, and refusing to drug screen. Moreover, despite knowing that the circuit court ordered the DHHR to pay for her water bill, petitioner failed to make the account available to her CPS worker when that information was requested. The CPS worker testified that petitioner did not feel that she had done anything wrong to initiate the proceedings and that she did not need to correct her behavior in order to regain custody of her child. The

service provider then testified that, upon attempting to initiate services, petitioner adamantly refused to participate, maintaining that she had done nothing wrong and had no need for services. When petitioner finally agreed to participate, she refused to allow the service provider into her home to address the conditions and demanded that her sessions take place elsewhere. Petitioner attended three sessions, despite her ability to have attended twelve had she complied from the initiation of the services. The service provider also testified that petitioner did not have an attachment to her child, as she seemed to place him second to arguing with the system. Further, the service provider stated that when asked if she would continue the child's therapy to address his sexual abuse were he returned to her care, petitioner indicated that she probably would not.

Petitioner then testified that she would do whatever was required of her in order to regain custody of her child. However, during cross examination, petitioner indicated her reluctance to participate. When asked what parenting problems petitioner would be addressing in services, she responded "I'm not sure . . . . That's why I was going to the class. Whether I needed to learn or not, I was just going to go through the motions to get my son back." Petitioner was then directly asked if she believed she needed to correct her behavior, to which she responded "I don't see that I do have a problem with how I raise my son." Further, petitioner indicated that she would not do what was required of her in order to regain custody of her son. When asked whether she would allow the service providers to come to her home every day if it meant getting her child back, petitioner responded "[t]o an extent. I won't just . . . give an all-out, 'Oh, I'll jump off the building if you say I'll get my son back.' I mean, there are limitations . . . to what a person can handle." When asked again whether she would allow the providers to come into her home every day in order to have her child back, she responded "I doubt it. Because I'm not even there every day." After hearing the testimony, the circuit court found that petitioner had not made sufficient efforts to rectify the circumstances leading to the filing of the petition as she had not followed through with the family case plan or other rehabilitative efforts. Ultimately, the circuit court terminated petitioner's parental rights based upon findings that there was no reasonable likelihood that she could correct the conditions of abuse in the near future and that termination was necessary for the child's welfare. It is from this dispositional order dated August 29, 2017, that petitioner appeals.[2]

The Court has previously established the following standard of review in cases such as this:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire

---

[2]The unknown father's parental rights were also terminated during the proceedings below. The permanency plan is for the child to be adopted by a foster family following his completion of an inpatient program and the concurrent permanency plan is for guardianship following treatment.

evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in terminating her parental rights without first granting her a meaningful improvement period tailored to her needs. We disagree. Pursuant to West Virginia Code § 49-4-610, "[a] court may grant a [parent] an improvement period . . . when . . . the [parent] files a written motion . . . [and] demonstrates, by clear and convincing evidence, that the [parent] is likely to fully participate in the improvement period[.]" The record on appeal is devoid of any such written motion. In fact, at the dispositional hearing, counsel for petitioner specifically stated that she was not requesting a formal improvement period based on petitioner's past performance. Moreover, the decision to grant or deny an improvement period rests in the sound discretion of the circuit court. *See In re: M.M.*, 236 W.Va. 108, 115, 778 S.E.2d 338, 345 (2015) (holding that "West Virginia law allows the circuit court discretion in deciding whether to grant a parent an improvement period"); Syl. Pt. 6, in part, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996) (holding that "[i]t is within the court's discretion to grant an improvement period within the applicable statutory requirements"). We have also held that a parent's "entitlement to an improvement period is conditioned upon the ability of the [parent] to demonstrate 'by clear and convincing evidence, that the [parent] is likely to fully participate in the improvement period . . . .'" *In re: Charity H.*, 215 W.Va. 208, 215, 599 S.E.2d 631, 638 (2004).

Here, even if petitioner had filed a written motion, it is clear from the record that she failed to demonstrate her ability to fully participate in an improvement period. Contrary to her argument that the services provided were not tailored to her needs or those of the child, the record indicates that petitioner was offered extensive services to address several issues, such as her lack of utilities, parenting skills, and attachment to her child. While petitioner argues that there was no clear plan addressed at remedying specific issues, the circuit court clearly explained that petitioner was adjudicated as an abusing parent based upon her failure to meet the needs of her son, including therapy regarding his sexual abuse, and ordered her to follow the enumerated, specific recommendations in the psychological evaluation report. However, petitioner failed to follow through with the requirements imposed. She did not drug screen, failed to attend her individualized therapy sessions, refused to participate in adult life skills and individualized parenting classes, and failed to cooperate with CPS in order to have her utilities turned back on. Moreover, petitioner consistently denied throughout the proceedings that she needed to correct her behavior. We have previously held that

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable

and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W.Va. 44, 55, 743 S.E.2d 352, 363 (2013) (quoting *In re: Charity H.*, at 217, 599 S.E.2d at 640). As such, we find that petitioner failed to demonstrate her ability to fully participate in an improvement period as evidenced by her complete lack of acknowledgement of the situation and her failure to follow through with any of the services provided to her.

Further, we find no error in the termination of petitioner's parental rights. West Virginia Code § 49-4-604(b)(6) provides that circuit courts are to terminate parental rights upon findings that there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the child's welfare. According to West Virginia Code § 49-4-604(c)(3), a situation in which there is no reasonable likelihood the conditions of abuse and neglect can be substantially corrected includes one in which

> [t]he abusing parent . . . [has] not responded to or followed through with a reasonable family case plan or other rehabilitative efforts of social, medical, mental health or other rehabilitative agencies designed to reduce or prevent the abuse or neglect of the child, as evidenced by the continuation or insubstantial diminution of conditions which threatened the health, welfare or life of the child[.]

The record establishes that there was no reasonable likelihood that petitioner could correct the conditions of abuse and neglect. As mentioned, petitioner was given the opportunity to participate in services in an effort to regain custody of her child. The service provider testified that she explained to petitioner that her failure to cooperate with the services could lead to the termination of her parental rights and, despite this knowledge, petitioner refused to participate in any services, including simply giving the CPS worker her city water account information so that they could pay her bill and have the utility reinstated. Further, when asked at the dispositional hearing whether she would cooperate with service providers in an effort to regain custody of her son, petitioner responded "I doubt it." While petitioner argues that an improvement period tailored to her demands was warranted before termination of her parental rights, we have previously held that

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, W. Va.Code [§] 49-6-5 [now West Virginia Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under W. Va.Code [§] 49-6-5(b) [now West Virginia Code § 49-4-604(c)] . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W.Va. 558, 712 S.E.2d 55 (2011). The record demonstrates that there was no reasonable likelihood that petitioner could correct the conditions of abuse and neglect and that termination was required for the child's welfare. Despite the child's admission to an acute mental hospital due to his emotional problems and suicidal ideations, petitioner

testified at disposition that she did not believe there was a problem with how she chose to raise her child and stated that she was unlikely to participate in the services targeted at restoring custody. As such, the circuit court did not err in terminating her parental rights.

For the foregoing reasons, we find no error in the decision of the circuit court, and its August 29, 2017, order is hereby affirmed.

Affirmed.

**ISSUED**:  February 23, 2018


**CONCURRED IN BY**:

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Menis E. Ketchum
Justice Allen H. Loughry II
Justice Elizabeth D. Walker

6